UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **BOES IRON WORKS, INC.** | * | CIVIL ACTION NO. 2:13-cv-4757 |
| | * | |
| **VERSUS** | * | SECTION "B" (4) |
| | * | |
| **DWG & ASSOCIATES, LLC, ET AL** | * | HONORABLE IVAN L.R. LEMELLE |
| | * | |
| | * | MAG. KAREN WELLS ROBY |
| | * | |
| ************************************** | | |

### PLAINTIFF BOES IRON WORKS, INC.'S POST-TRIAL MEMORANDUM

**NOW INTO COURT**, through undersigned counsel, comes plaintiff, Boes Iron Works, Inc. ("Boes"), who in accord with this Court's order following presentation of evidence on September 29, 2014, submits the following post-trial memorandum.

**I.      SUMMARY OF RELEVANT TRIAL TESTIMONY & EXHIBITS**

Boes incorporates the background of this matter is set forth in Section 6 of the Proposed Pretrial Order (R. Doc. 63) as if included herein *in extenso*. As testified to by all parties, in late 2010 and early 2011, DWG & Associates, LLC ("DWG") issued an original and revised purchase order to Boes to supply various metal material (ornamental and structural steel) in support of repair to/renovation of the Carrolton Water Plant Power Complex in New Orleans, Louisiana (the "Project"). *See* Purchase Order FL10002D and FL10002D REVISED, Exhibits "2" and "5." Craig Boes testified that both the original and revised purchase orders were issued by DWG in response to proposals submitted by Boes. *See* Exhibits "1" and "3." According to Mr. Boes, the proposals were submitted following request for same by "Kalyla," an assistant to Samuel Harbart, DWG's original Project Manager for the Project.

Notably, all witnesses acknowledged that the original and revised purchase orders issued to Boes were issued on DWG's (*not* Boes') form.  Additionally, all witnesses acknowledged that both Boes' proposals and DWG's purchase orders were "lump sum" as opposed to time and material or cost plus in nature.  Further, all witnesses acknowledged that neither the original nor the revised purchase order required itemized billing, submission of a schedule of values, or that Boes track and supply material costs or shop labor hours relating to fabrication of steel; rather, the payment terms were simply "NET 30 DAYS."  *See* Exhibits "2" and "5."  Lastly, all witnesses acknowledged that neither the original nor the revised purchase order contained provisions for termination at DWG's convenience, or how Boes' compensation would be calculated if its purchase order were terminated.

After Boes began supplying material, DWG management discovered that the Project was severely over budget.  Specifically, Brent Berry ("Berry"), DWG's former CFO and 49% interest holder, testified that at some point in late 2011, DWG discovered that numerous "scopes of work" were left out of DWG's original budget making the cost to complete the Project much higher than DWG anticipated.  In response, Berry and Brian Cooper ("Cooper") (DWG's Director of Eastern Operations and Senior Project Manager for the Project) began approaching DWG's various subcontractors and suppliers in an effort to reduce costs.

With regard to Boes, Cooper and Berry testified that at or around New Year's 2012, they met with Mr. Boes and asked that his company revisit its price to supply structural and ornamental steel.  Boes provided a proposed revised/reduced price; however, Berry and Cooper testified that Boes' reduced price still did not "fit" within DWG's budget.  Unbeknownst to Boes, during this time, and while Boes still possessed a valid purchase order from DWG, DWG sought a proposal from and issued a purchase order to Slay Steel for the remaining portion

of Boes' work. *See* Exhibit "40." When asked, both Berry and Cooper admitted they did not share Slay Steel's identity or price with Boes during their conversations.

On or about January 31, 2012, Boes issued Invoice No. 32805 in the amount of $759,272.00 to DWG as a "Partial Progress Billing for material provided in accordance with POFL10002D[.]" *See* Exhibit "11." Prior to January 31, 2012, Boes had issued two other invoices in the amount of $2,611.00 and $525.00 for various "extra" material (flat bar and metal shims) not included within the scope of Boes' original proposals. *See* Exhibits "9" and "10." Therefore, as of January 31, 2012, the total outstanding amount invoiced by Boes on the Project was $762,408.00.

On February 14, 2012, Cooper instructed Amber Jeberg, DWG's Office Manager, to reject Boes' Invoice 32805. *See* Exhibit "15" at GAIC 224. Cooper testified that he rejected Invoice 32805 because it was not itemized as to price, and did not contain supporting detail regarding material and/or labor cost. Although Cooper stated these reasons at trial, he admitted that neither were communicated to Boes at the time he rejected Boes' invoice.

On February 17, 2012, Mr. Boes emailed Cooper and Berry regarding rejection of Invoice 32805. *See* Exhibit "16" at BOES 115. Specifically, Mr. Boes noted that Invoice 32805 had been rejected "with no explanation[,]" and that Boes would "proceed with filing a lien on the project as well as any other means Required (sic) to collect the outstanding balance." *Id.* In response to Mr. Boes' email, Berry stated that he was "alarmed to see this[,]" and promised to look into the situation "immediately." *See* Exhibit "16" at BOES 114. As testified to by Berry, he was "alarmed" because it was violation of DWG protocol to reject an invoice without explanation.

Following reprimand of Cooper, Berry "took the lead" on communicating with Mr. Boes regarding Boes' invoices. Dissatisfied with the progress of payment, Boes began writing the U.S. Army Corps of Engineers and DWG's higher-tier contractors. In response, Berry issued a Stop Work Order to Boes requesting that Boes "stop all work related to [the Project], including the fabrication of any items under the Purchase Order" until such time as all issues surrounding Boes' invoices could be resolved. *See* Exhibit "19." In closing, Berry indicated that he "look[ed] forward to amicably settling this matter with [Boes]." *Id.*

Following submission of the Stop Work Order, Berry emailed Mr. Boes acknowledging that "DWG did not handle [Boes' invoices] well[,]" and stating that he "want[ed] to make things right with [Boes]." *See* Exhibit "21" at BOES 126. To this end, Berry proposed to resolve all billing issues by "replac[ing] all versions" of Purchase Order FL10002D with a new one "that is fair to [Boes] and that DWG can handle." *Id.* In total, Berry proposed that DWG pay Boes $430,956.00. In response Mr. Boes indicated $430,956.00 was insufficient to resolve DWG's balance. *Id.* Following this, Berry asked that Mr. Boes provide DWG with "[his] figures for resolving [Boes' invoices.]" *See* Exhibit "21" at BOES 125. Additionally, Berry asked to meet with Mr. Boes to discuss the matter. *Id.*

Berry, Cooper and Boes each testified that following this email exchange, Berry met with Mr. Boes in Boes' office on March 8, 2012. During his deposition and at trial, Cooper testified that the purpose for this meeting was to "work out" and/or derive a "final value" as to what was owed to Boes. Additionally, during his deposition and at trial, Berry testified that the purpose of this meeting was to "resolve" or "settle" Boes' invoices. Further, both Berry and Boes testified that during their meeting, they discussed what amount Boes would accept in connection with its invoices.

While Berry could not recall if he mentioned $659,000.00 during his meeting with Mr. Boes, it is undisputed that one week later, Berry emailed Mr. Boes offering to pay this amount. *See* Exhibit "42." In his email, Berry reiterated that the Project was "deeply under water[,]" and that he was "trying his best to be both fair to [Boes] and keep [the payment] within a range [DWG could] handle[.]" *Id.* Additionally, attached to Berry's email was a draft "SETTLEMENT AGREEMENT" which cited "disputes" and/or "confusion" over Boes' invoices and payment applications, and indicated a desire to resolve all such disputes and/or confusion via payment of $659,000.00 on a set schedule. *See* Exhibit "42" at BOES 310-314. Shortly after Berry tendered DWG's offer to pay $659,000.00 to Boes for its work, Berry followed-up with Mr. Boes indicating that he thought it was "in both [DWG and Boes'] interest to get [Boes' invoices] worked out sooner than later." *See* Exhibit "25" at BOES 290. Mr. Boes responded "Yes please proceed[.]" *See* Exhibit "25" at BOES 289.

In total, DWG issued two payments to Boes: $50,000.00 on or about April 3, 2012, and $200,000.00 on or about May 18, 2012. *See* Exhibits "37" and "38." According to Berry, it was he who authorized issuance of both payments. In fact, the "stub" to DWG's $200,000.00 check contains the following notation: "5-1-12 NEG PER BB" (*see* Exhibit "38") which Berry testified meant "Negotiated per Brent Berry[.]"

Additionally, both Berry and Cooper acknowledged that in accord with DWG policy, neither check would have been delivered unless Boes executed a lien release. While the lien release for the $50,000.00 payment could not be located, the lien release for the $200,000.00 check was. *See* "PARTIAL WAIVER OF LIEN ON PROGRESS PAYMENT," Exhibit "45" at Boes 42. Although DWG has steadfastly maintained the $200,000.00 payment to Boes constituted full and final payment for all material Boes supplied prior to May 18, 2012 (the

5

effective date of the release), under cross examination, Berry admitted that the following language in the release provided by Boes in exchange for the $200,000.00 check conflicted with DWG's position:

> This release, together with all previous releases of any mechanic's lien, stop notice, bond right, claim for payment and any rights under any similar ordinance, rule or statute related to claim or payment rights for persons in the Subcontractor's position, if any, does not cover all amounts due to Subcontractor for labor, services, equipment, and/or material furnished to or for the benefit of the Project by Subcontractor through the Release Date, and shall not otherwise affect the Contract, statutory or lien rights of the undersigned, including rights between the parties to the Contract based upon a rescission, abandonment, or breach of the Contract, or the right of the undersigned to recover compensation for furnished labor, services, equipment or material covered by this release, to the extent such labor, services, equipment or material furnished by Subcontractor was not compensated by the progress payment.

*See* Exhibit "45" at BOES 42.

Following tender of the above checks to Boes, DWG failed to remit any additional funds. Additionally, DWG denied entry into a compromise of Boes' invoices and/or purchase order amount for $659,000.00. Notably, although DWG denies entering into a compromise with Boes regarding Boes' invoices and/or purchase order amount, and claims the $200,000.00 payment to Boes on or about May 18, 2012 was the final amount owed to Boes, on **July 8, 2012**, two months ***after*** the alleged "final payment" to Boes, Cooper emailed Berry stating that "$8,887.00 should be held from ***the settlement*** with Boes for the diesel pump stair they failed to provide." *See* Exhibit "28" (emphasis added).

Given DWG's failure to pay as agreed, Boes began pressuring Great American Insurance Company ("GAIC"), DWG's bonding company, for payment. In connection with its bond claim, Boes submitted numerous documents to GAIC on October 4 and November 13, 2012 to include Boes' invoices, various correspondence, material delivery tickets and shop/detail drawings as well as documentation of the parties' $659,000.00 agreement. *See* Exhibits "29"

6

and "46." Astonishingly, Barry Moore ("Moore"), GAIC's corporate representative, was unable to provide insight into what, if anything, GAIC's claims personnel did in response to Boes' submittals. Further, Moore admitted that the first time he performed *any* analysis of Boes' claim was on February 11, 2014, nearly two years *after* GAIC first learned of Boes' payment issues on the Project, and one year *after* GAIC formally rejected Boes' bond claim. *See* Exhibits "47" and "48." Although Moore's analysis (Exhibit "48") indicated Boes was due additional sums, GAIC failed to remit any funds to Boes. Instead, GAIC and DWG have continuously maintained that the $250,000.00 paid to Boes is either equal to or greater than what Boes is owed for material it supplied.

As testified to by Cooper and Moore, following DWG's issuance of the Stop Work Order to Boes, the U.S. Army Corps of Engineers de-scoped the "Power House" portion of the Project. Following this, DWG and GAIC prepared a proposed change order deduct and submitted same to Dii, DWG's higher-tier contactor on the job. *See* Exhibit "50." During trial, Cooper and Moore admitted that this proposed deduct includes a line-item value for the remaining steel Boes was to supply pursuant to its purchase order but did not. *See* Exhibit "50" at GAIC 462. Specifically, in connection with the proposed deduction, DWG and GAIC (Cooper and Moore) estimated the value of the remaining steel at $686,871.00. *Id.* When questioned, Cooper, Berry and Moore agreed that the total amount of Boes' invoices ($762,408.00) was over $100,000.00 **less than** the value of Boes' revised purchase order ($1,553,849.00) minus the value assigned by DWG and GAIC to the remaining steel. Despite this admission, neither DWG nor GAIC have remitted any additional sums to Boes claiming that Boes has been fully compensated for the material it supplied to the Project.

## II. LAW AND ARGUMENT

Following close of evidence, this Honorable Court requested that the parties provide post-trial briefs regarding whether the $659,000.00 deal between Boes and DWG amounted to a settlement of contemplated litigation, or a renegotiated price as to invoices and/or purchase order amount. Additionally, this Honorable Court invited the parties to brief any other issues they believed relevant to disposition of this case. Boes offers the following.

### A. The $659,000.00 deal constituted a renegotiated price as to Boes' invoice and/or purchase order amount, not settlement of contemplated litigation.

Initially, this Honorable Court requested that the parties address the issue of whether the $659,000.00 deal between Boes and DWG amounted to a settlement of contemplated litigation, or a renegotiated price as to Boes' invoices and/or purchase order amount. Boes avers this issue is a softball for the court as all testimony and exhibits in this matter indicate the purpose of the negotiations between the parties was to "work out" what Boes was owed for the steel material it had supplied to the Project.

Specifically, as noted above, in late 2011, DWG discovered the Project was over budget. Following this discovery, DWG requested that its subcontractors and material suppliers to revisit their prices in an effort to bring the Project budget in line. Around New Years 2012, Berry and Cooper met with Mr. Boes regarding Boes' purchase order amount, and requested that Boes consider reducing its price to supply steel. Boes offered to reduce its price; however, according to Berry and Cooper, Boes' reduced price still did not fit within DWG's budget.

On January 31, 2012, Boes issued Invoice 32805 as a "Partial progress billing" for material it had supplied to date under its purchase order. *See* Exhibit "11." Immediately after issuance of Invoice 32805, DWG personnel broached the possibility of "settling" Boes' invoice amount for a lesser sum. Specifically, on March 6, 2012, Berry forwarded a Stop Work

8

Notice to Boes, and asked that Mr. Boes contact him so they could discuss Boes' invoice amounts. *See* Exhibit "20." In the actual Stop Work Notice, Berry states that he "look[s] forward to amicably settling this matter with [Boes]." *See* Exhibit "19."

Following Mr. Boes' initial reply to Berry, Berry acknowledged DWG "did not handle [Boes' invoices] well[,]" and stated that he "want[ed] to make things right with [Boes]." *See* Exhibit "21" at BOES 126. In this regard, Berry proposed to replace all versions of Boes' purchase order with a new one in the amount of $430,956.00. *Id.* In Berry's opinion, this amount was "fair to [Boes]" and was a range "DWG can handle." *Id.* Mr. Boes responded indicating that $430,956.00 was insufficient to resolve the balance owed. *Id.*

Following Boes' rejection of DWG's $430,956.00 offer, Berry requested that Mr. Boes provide DWG "with [Boes'] figures for resolving" the invoice amounts. *See* Exhibit "21" at BOES 125. Additionally, Berry requested an in-person meeting with Mr. Boes to discuss the matter further. *Id.* As testified to by Berry, Cooper and Boes, Berry and Boes met in person in Boes' office on March 8, 2012.

As noted above, Cooper testified both in deposition and at trial that the purpose of Berry's meeting with Boes was to "work out" and/or derive a "final value" as to what DWG owed to Boes. Additionally, Berry testified during his deposition and at trial that the purpose of his meeting with Boes was to "resolve" or "settle" Boes' invoice amounts. Further, both Berry and Boes testified that during their meeting, they discussed Boes' invoices, and what amount Boes would accept in satisfaction of same. While Berry could not recall if he mentioned $659,000.00 during this meeting or not, it is undisputed that one week after Mr. Boes and Berry met, Berry emailed Mr. Boes offering to pay this amount. *See* Exhibit "42."

In his email, Berry reiterated that the Project was "deeply under water" and that he was "trying [his] best to be both fair to [Boes] and keep [the payment] within a range [DWG could] handle." *Id.* Additionally, Berry attached a draft "SETTLEMENT AGREEMENT" wherein the recitals reference "confusion" and/or "disagreements" over Boes' invoices and pay requests. *See* Exhibit 42 at BOES 310-314. Further, in Paragraph K of the draft "SETTLEMENT AGREEMENT," the stated purpose is to "settle" and/or "compromise" and end the "confusion" or "disagreements" over Boes' invoices. *See* Exhibit "42" at BOES 311, Paragraph K.

Nowhere in the draft "SETTLEMENT AGREEMENT" is litigation (current or contemplated) mentioned. Additionally, the record of this matter is completely devoid of any documentary or testimonial evidence whereby either of the parties threatened litigation in connection with any "confusion" or "disagreement" over Boes' invoices. In fact, suit was not filed until April 29, 2013 (*see* R. Doc. 1-2) following counsel for GAIC's April 3, 2013 transmission indicating that no additional funds would be forthcoming. *See* Exhibit "47."

Given all correspondence between the parties refers to "resolving" or "settling" Boes' invoices or replacing all versions of Boes' purchase order with one in a different amount, given Cooper and Berry's admissions that the purpose of Berry's in-person meeting with Mr. Boes was to "work out," derive a "final value" for, and/or "resolve" or "settle" Boes' invoices, given the draft "SETTLEMENT AGREEMENT" refers to resolution of any "confusion" or "disagreements" regarding Boes' invoices or pay applications, and given litigation was not mentioned in connection with Boes' invoices until <u>after</u> GAIC (who had taken over executive control of the project) indicated no additional funds would be forthcoming, Boes avers that it is

clear the $659,000.00 deal between Boes and DWG amounted to a renegotiated price as to Boes' invoices and/or purchase order amount, not settlement of contemplated litigation.

      **B.     As surety, GAIC is responsible for all amounts determined to be owed by DWG to Boes.**

DWG's subcontract with Dii required that DWG make timely payments to its subcontractors or suppliers on the Project, and ensure no liens were filed by same.  *See* Exhibit "75," Page 5, at Subsection 9.  In order to ensure compliance with this obligation, Dii required that DWG procure a payment bond in an amount of 100% of the price of DWG's work.  *Id.* at Page 15, Subsection 14.14.  In accord with this requirement, DWG obtained a Subcontract Labor and Material Payment Bond from GAIC in the amount of $16,875,912.00.  *See* Exhibit "39."  As testified to by Moore, the premium for GAIC's bond was based upon this figure which presumably included Boes' purchase order amount.  Further, Moore acknowledged that if DWG simply made a "bad deal" with any of its vendors, DWG and GAIC were stuck with that price.

Under the terms of the bond issued by GAIC, should DWG fail to pay any of its subcontractors or suppliers for labor or material used or reasonably required for use in connection with the Project, such subcontractor or supplier shall have a right to sue on the bond, prosecute the claim to final judgment, and execute against GAIC for any sums determined to be owed.  *Id.*  Throughout this matter, GAIC has attempted to draw a line between itself and DWG claiming it is not responsible for any "compromise" or "settlement" Boes and DWG may have entered into.  However, as indicated above, any compromise or settlement Boes and DWG entered into was for the express purpose of resolving Boes' invoice and/or purchase order amount, and thus liquidated the amount Boes was owed for steel material provided pursuant to its purchase order.  Pursuant to the bond terms, if DWG fails to pay this amount, GAIC owes

same.  The only thing GAIC is entitled to is credit for the $250,000.00 DWG remitted to Boes leaving a balance due of $409,000.00.

Assuming, *arguendo*, this Honorable Court finds that DWG and Boes did not perfect the $659,000.00 agreement, Boes avers it would be owed one of two amounts: (a) $512,408.00, or (b) $616,978.00.  The reason for this is that in general, the measure of damages for breach of contract is the sum that would place the non-breaching party (here, Boes) in the same position as if the full obligation (here, delivery of all steel) had been fulfilled.  *See Meltzer v. Roof Coatings, Inc.*, 536 F.2d 663, 666 (5th Cir. 1976).  *See also Frankel v. Exxon Mobil Corp.*, 2004-1236 (La. App. 1 Cir. 8/10/05), 923 So.2d 55, 64; La. Civil Code art. 1995.

In the present case, based upon his 30+ years of experience in the industry, his personally preparing the bid for the Project, and his personal knowledge of what material was provided in support of the Project (including extras), Mr. Boes testified that $762,408.00 is the amount due Boes for the material it actually supplied.  Following subtraction of the $250,000.00 paid by DWG, Boes is owed $512,408.00.  Additionally, if the court were to subtract the value DWG and GAIC assigned to the remaining steel ($686,871.00) from Boes' revised purchase order amount ($1,553.849.00), the total comes to $866,978.00.[1]  Following application of the $250,000.00 paid by DWG, the remaining balance is $616,978.00.

In sum, Boes believes it had an agreement with DWG for $659,000.00.  However, should this Honorable Court accept DWG's position and find that DWG and Boes did not perfect an agreement to pay/accept $659,000.00 for Boes' work, in accord with *Meltzer*, *Frankel*, and/or Louisiana Civil Code article 1995, this Honorable Court should find that Boes is owed (a) $512,408.00 (Boes' $762,408.00 invoice amount less $250,000.00 paid by DWG), or (b)

---

[1] Notably, the balance owed following subtraction of the value DWG/GAIC assigned to the remaining steel is $104,570.00 more than Boes' invoice amount.

12

$616,978.00 (Boes' $1,553,849.00 Revised Purchase Order Amount, less the $686,871.00 value of non-supplied steel, less $250,000.00 paid by DWG). Further, in accord with the bond GAIC issued, this Honorable Court should hold GAIC held liable for any amounts determined to be owed to Boes.

    **C.    This Honorable Court should award Boes ten percent (10%) attorney's fees on the amount recovered insofar as Boes made demand on DWG and GAIC, and GAIC failed to pay Boes within thirty days.**

Louisiana Revised Statute Title 9, Section 3902 provides that if a "surety on a bond fails to pay his obligation and it becomes necessary for the creditor to sue thereon, the latter shall be entitled to ten per cent attorney's fees on the amount recovered[.]" *See* La. Rev. Stat. § 9:3902. The only requirements are that the creditor must have employed an attorney, made written demand upon the principal and surety, and more than thirty days have elapsed without payment being made with the full amount claimed in the demand being recovered.

During trial and discovery, GAIC and DWG admitted they first received correspondence from undersigned counsel regarding outstanding sums owed to Boes on or about March 2, 2012. *See* Exhibit "55(C)" at Response to Interrogatory No. 9. Additionally, at all times relevant to this case, Boes has demanded payment of $409,000.00 in satisfaction of its claim. *See* Exhibit "68(B)" at Response to Interrogatory Nos. 1 and 2. This figure is calculated by subtracting the $250,000.00 paid by DWG from the $659,000.00 DWG offered to pay, and Boes agreed to accept. *Id.* Notice of this specific amount was sent to counsel for DWG and GAIC no later than May 23, 2014. *Id.* As of this pleading (more than thirty days later), payment has not been made.

As set forth above, Boes avers it is owed one of three amounts: (a) $409,000.00, (b) $512,408.00, or (c) $616,978.00. Should this Honorable Court award either of these

amounts, Boes avers it is entitled to an attorney's fees award totaling ten percent (10%) of the amount recovered insofar as Boes employed an attorney, made written demand upon DWG and GAIC, and more than thirty days elapsed without payment being made. Accordingly, this Honorable Court should add an attorney's fee award of ten percent (10%) to any judgment entered against GAIC.

      **D.**      **Mr. Boes' testimony is more credible than that of Berry, Cooper and/or Moore; therefore, this Honorable Court should accept Boes' accounting of events and/or values over that of DWG and GAIC.**

As noted by the court, a large portion of this case comes down to credibility of the witnesses. In this regard, Boes avers that Berry's testimony that $309,000.00 of the proposed $659,000.00 payment did not relate to the value of material Boes supplied, but instead was "free money" offered as an incentive for Boes to settle, lacks credibility. As pointed out by this court, companies are not in the business of giving away "free money," and "free money" will not be found on any accounting ledger of a viable business.

Further, Boes avers that each defense witnesses' attempt to shield GAIC's assumption of control of the Project in June, 2012 upon Moore's arrival speaks volumes to their credibility.

Lastly, during discovery and at trial, Berry admitted he and his wife are 100% guarantors under the Bond issued by GAIC, and are responsible for reimbursing GAIC for any and all costs (like payment to Boes) GAIC incurs pursuant to the bond. Likewise, Berry admitted that he and GAIC entered into a Forbearance Agreement (Exhibit "72") shortly after Boes' suit was filed whereby GAIC agreed to forbear collecting on the guaranty, and released its security interest in Berry's family home. Additionally, Berry admitted that at the same time undersigned counsel began requesting his deposition in this case, GAIC entertained the idea of a

complete release of the guaranty. *See* Exhibit "71." Notably, both the forbearance agreement and release are contingent upon Berry's continued cooperation with GAIC including providing information relating to Boes' claim. Given Berry's relief from his guaranty is contingent upon his "cooperation" with GAIC to include providing information relating to Boes' claim, Boes believes Berry's testimony is highly suspect, and lacks credibility.

Combined with the documentary evidence regarding Boes' proposals/purchase orders, and Berry and Mr. Boes meeting regarding Boes' invoices, and given the value DWG and GAIC placed on the remaining steel Boes was to supply, Boes believes the credibility issues cited above lead to one conclusion: Mr. Boes' testimony (and hence Boes' claim) is more credible than that of defendants, and this Honorable Court should accept Boes' accounting of events and/or values over that of DWG and GAIC.

### III. CONCLUSION

Through the course of this case and at trial, it became obvious that someone at DWG (presumably Samuel Harbert, the former Project Manager for the Project who was discharged for negligence) erred in creation of the Project budget. Prior to this discovery, DWG issued an original and revised lump sum purchase order to Boes in the amount of $1,553,849.00 for a gross set of steel material. Neither Boes' proposal nor DWG's purchase order were itemized in nature, or required submission of a schedule of values or underlying material costs and shop labor time in support of Boes' invoices. Rather, the original and revised purchase order payment terms were simply "NET 30 DAYS."

DWG never questioned Boes' quote until after the budget problem was discovered. Following Boes' submission of a revised, lower quote at DWG's request, and DWG's rejection of same, DWG began questioning Boes' prices, and even referred to such as

15

"highway robbery." With all due respect, Boes had no part in creation of DWG's budget, and Boes' "highway robbery" prices are what DWG freely agreed to without any evidence of trickery or collusion between Mr. Boes and Mr. Harbert. In fact, Mr. Boes' testified that this Project was Boes' first and only dealing with DWG and/or Mr. Harbert. Further, at the time of acceptance of Boes' proposals, DWG had been in business for years, and employed numerous staff including skilled project managers. When questioned by this court, Cooper admitted DWG was not a "virgin" company, and had access to information regarding market prices of steel at the time DWG accepted Boes' proposal. Thus, if DWG truly thought Boes' price was too high, it was free to counter or select a competitor's quote. It did not do so, and now wants to pay Boes "pennies on the dollar" of what it previously agreed to simply because DWG, in hindsight, believes Boes' proposal was too high based upon competitor pricing it received <u>after the fact</u>.

Given the testimony of all witnesses at trial, and the documentary evidence surrounding the parties' negotiation of Boes' invoices, Boes avers that this Honorable Court should find that the parties consummated a deal whereby DWG would pay $659,000.00 for steel Boes supplied to the Project, and the deal amounted to a renegotiated price as to Boes' invoices and/or purchase order amounts, not a settlement of contemplated litigation. In the alternative, should this Honorable Court find that Boes and DWG did not consummate a deal whereby DWG would pay $659,000.00 for steel Boes supplied to the Project, for the reasons set forth above, this Honorable Court should find that Boes is owed either (a) $512,408.00 (Boes' $762,408.00 invoice amount less $250,000.00 paid by DWG), or (b) $616,978.00 (Boes' $1,553,849.00 Revised Purchase Order Amount, less $686,871.00 value assigned by DWG and GAIC to the non-supplied steel, less $250,000.00 paid by DWG).

Further, in accord with the bond GAIC issued, this Honorable Court should hold GAIC held liable for any amounts determined to be owed.

Lastly, insofar as Boes employed an attorney, made written demand upon DWG and GAIC, and more than thirty days elapsed without payment being made, this Honorable Court should add an attorney's fee award of ten percent (10%) to any judgment entered against GAIC.

        Respectfully submitted,

        /s/ *Keith L. Magness*

        _____
        Keith L. Magness, T.A. (29962)
        klm@magnesslaw.com
        Law Office of Keith L. Magness, LLC
        901 Derbigny Street
        Gretna, Louisiana 70053
        Telephone: (504) 264-5587
        Facsimile:  (504) 264-5580

        Counsel for Plaintiff,
        Boes Iron Works, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2014, I forwarded a copy of the foregoing to all parties and/or counsel of record via facsimile, electronic mail, and/or United States mail, properly addressed and postage prepaid.

        */s/ Keith L. Magness*
        _____
        KEITH L. MAGNESS